IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| WILLIAM MOODY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 2:18-cv-1004-WC |
| | ) | [WO] |
| ANDREW SAUL,[1] | ) | |
| Commissioner, Social Security | ) | |
| Administration | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

## I.   INTRODUCTION

William Moody ("Moody" or "Plaintiff") filed a Title XVI for supplemental security income on February 8, 2015, alleging disability beginning on September 14, 2014. R. 16, 187–92. The application was denied at the initial administrative level. Plaintiff then requested and received a hearing before an Administrative Law Judge ("ALJ") on April 25, 2017. R. 105–06, 134–39. Following the hearing, the ALJ issued an unfavorable decision, and the Appeals Council denied Plaintiff's request for review on October 2, 2018. R. 1–3. The ALJ's decision consequently became the final decision of the Commissioner of Social Security ("Commissioner").[2] *See Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir.

---

[1] Andrew Saul is now the Commissioner of Social Security and is automatically substituted as a party pursuant to Fed. R. Civ. P. 25(d). *See also* §205(g) of the Social Security Act, 42 U.S.C. § 405(g) (action survives regardless of any change in the person occupying the office of Commissioner of Social Security).
[2] Pursuant to the Social Security Independence and Program Improvements Act of 1994, Pub. L. No. 103-296, 108 Stat. 1464, the functions of the Secretary of Health and Human Services with respect to Social Security matters were transferred to the Commissioner of Social Security.

1986). The case is now before the court for review of that decision under 42 U.S.C. § 405(g). Pursuant to 28 U.S.C. § 636(c), both parties have consented to the conduct of all proceedings and entry of a final judgment by the undersigned United States Magistrate Judge. Pl.'s Consent to Jurisdiction (Doc. 10); Gov't's Consent to Jurisdiction (Doc. 9). After careful scrutiny of the record and the parties' briefs, and for the reasons herein explained, the Court AFFIRMS the Commissioner's decision.

## II. STANDARD OF REVIEW

The Court's review of the Commissioner's decision is a limited one. The Court's sole function is to determine whether the ALJ's opinion is supported by substantial evidence and whether the proper legal standards were applied. *See Jones v. Apfel,* 190 F.3d 1224, 1228 (11th Cir. 1999); *Bloodsworth v. Heckler,* 703 F.2d 1233, 1239 (11th Cir. 1983).

"The Social Security Act mandates that 'findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive.'" *Foote v. Chater,* 67 F.3d 1553, 1560 (11th Cir. 1995) (quoting 42 U.S.C. §405(g)). Thus, this Court must find the Commissioner's decision conclusive if it is supported by substantial evidence. *Graham v. Apfel,* 129 F.3d 1420, 1422 (11th Cir. 1997). Substantial evidence is more than a scintilla — i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *Lewis v. Callahan,* 125 F.3d 1436, 1440 (11th Cir. 1997) (citing *Richardson v. Perales,* 402 U.S. 389 (1971)); *Foote,* 67 F.3d at 1560 (citing *Walden v. Schweiker,* 672 F.2d 835, 838 (11th Cir. 1982)).

If the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the court would have reached a contrary result as finder of fact, and even if the evidence preponderates against the Commissioner's findings. *Ellison v. Barnhart,* 355 F.3d 1272, 1275 (11th Cir. 2003); *Edwards v. Sullivan,* 937 F.2d 580, 584 n.3 (11th Cir. 1991) (quoting *MacGregor v. Bowen,* 786 F.2d 1050, 1053 (11th Cir. 1986)). The Court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote,* 67 F.3d at 1560 (citing *Chester v. Bowen,* 792 F.2d 129, 131 (11th Cir. 1986). The Court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner]," but rather it "must defer to the Commissioner's decision if it is supported by substantial evidence." *Miles v. Chater,* 84 F.3d 1397, 1400 (11th Cir. 1997) (quoting *Bloodsworth,* 703 F.2d at 1239).

The Court will also reverse a Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law. *Keeton v. Dep't of Health and Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994) (citing *Cornelius v. Sullivan,* 936 F.2d 1143, 1145 (11th Cir. 1991)). There is no presumption that the Commissioner's conclusions of law are valid. *Id*.; *Brown v. Sullivan,* 921 F.2d 1233, 1236 (11th Cir. 1991) (quoting *MacGregor,* 786 F.2d at 1053).

### III. STATUTORY AND REGULATORY FRAMEWORK

The Social Security Act's general disability insurance benefits program ("DIB") provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence. *See* 42 U.S.C. §

423(a). The Social Security Act's Supplemental Security Income ("SSI") is a separate and distinct program. SSI is a general public assistance measure providing an additional resource to the aged, blind, and disabled to assure that their income does not fall below the poverty line. Eligibility for SSI is based upon proof of indigence and disability. *See* 42 U.S.C. §§ 1382(a), 1382c(a)(3)(A)–(C). However, despite the fact they are separate programs, the law and regulations governing a claim for DIB and a claim for SSI are identical; therefore, claims for DIB and SSI are treated identically for the purpose of determining whether a claimant is disabled. *Patterson v. Bowen,* 799 F.2d 1455, 1456 n.1 (11th Cir. 1986). Applicants under DIB and SSI must prove "disability" within the meaning of the Social Security Act which defines disability in virtually identical language for both programs. See 42 U.S.C. §§ 423(d), 1382c(a)(3), 1382c(a)(3)(G); 20 C.F.R. §§ 404.1505(a), 416.905(a). A person is entitled to disability benefits when the person is unable to

> Engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A "physical or mental impairment" is one resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner of Social Security employs a five-step, sequential evaluation process to determine whether a claimant is entitled to benefits. *See* 20 C.F.R. §§ 404.1520, 416.920 (2010).

    (1)    Is the person presently unemployed?

    (2)    Is the person's impairment(s) severe?

    (3)    Does the person's impairment(s) meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?

    (4)    Is the person unable to perform his or her former occupation?

    (5)    Is the person unable to perform any other work within the economy?

An affirmative answer to any of the questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen,* 800 F.2d 1026, 1030 (11th Cir. 1986).

The burden of proof rests on a claimant through Step 4. *See Phillips v. Barnhart,* 357 F.3d 1232, 1237-39 (11th Cir. 2004). Claimants establish a prima facie case of qualifying for disability once they meet the burden of proof from Step 1 through Step 4. At Step 5, the burden shifts to the Commissioner, who must then show there are a significant number of jobs in the national economy the claimant can perform. *Id.*

To perform the fourth and fifth steps, the ALJ must determine the claimant's Residual Functional Capacity ("RFC"). *Id.* at 1238–39. RFC is what the claimant is still able to do despite his impairments and is based on all relevant medical and other evidence. *Id.* It also can contain both exertional and nonexertional limitations. *Id.* at 1242–43. At the fifth step, the ALJ considers the claimant's RFC, age, education, and work experience

to determine if there are jobs available in the national economy the claimant can perform. *Id.* at 1239. To do this, the ALJ can either use the Medical Vocational Guidelines ("grids") or hear testimony from a vocational expert ("VE"). *Id.* at 1239–40.

The grids allow the ALJ to consider factors such as age, confinement to sedentary or light work, inability to speak English, educational deficiencies, and lack of job experience. Each factor can independently limit the number of jobs realistically available to an individual. *Id.* at 1240. Combinations of these factors yield a statutorily-required finding of "Disabled" or "Not Disabled." *Id.*

## IV. ADMINISTRATIVE PROCEEDINGS

William Moody was 35 years old at the time of the ALJ's decision. R. 25. He lives in Prattville, Alabama, with his wife and nine-year-old daughter. R. 20. He obtained his GED. R. 20. Moody's primary complaints are uncontrolled diabetes, seizures, bulging disc in his back, and anxiety. R. 18–21. In the past, Moody worked as an automotive machinist. R. 21.

Following an administrative hearing, and employing the five-step process, the ALJ found at Step One that Plaintiff "has not engaged in substantial gainful activity since February 8, 2015, the application date[.]" R. 18. At Step Two, the ALJ found that Moody suffers from the following severe impairments under 20 C.F.R. § 416.920(c): diabetes mellitus, affective disorders, and epilepsy. R. 18. But the ALJ concluded at Step Three of the analysis that none of Moody's impairments, nor a combination of his impairments, met or medically equaled the severity of one of those listed in the applicable regulations. R. 18–20. Next, the ALJ articulated Plaintiff's RFC as follows:

> the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except the claimant can frequently climb ramps or stairs, and occasionally climb ladders, ropes or scaffolds. He can frequently balance, stoop, kneel, crouch or crawl but can never work at unprotected heights, around moving mechanical parts or operate a motor vehicle as part of job duties. The claimant is limited to performing simple routine tasks, is limited to simple work related decisions and his time off task can be accommodated by normal breaks. He can frequently respond appropriately to supervisors, coworkers and the general public.

R. 20. At Step Four, having consulted with a VE, the ALJ concluded that Plaintiff has past work as an automotive machinist, but he "is unable to perform any past relevant work." R. 25. The ALJ next concluded, at Step Five, that "there are jobs that exist in significant numbers in the national economy that the claimant can perform." R. 25. Based upon the testimony of the VE, the ALJ identified the following as representative occupations: a "garment sorter," a "small products assembler," a "mail clerk," "telephone order clerk," document preparer/scanner," and "addresser." R. 26. Accordingly, the ALJ concluded that Plaintiff "has not been under a disability [. . .] since February 8, 2015, the date the application was filed." R. 26. Based on these findings, the ALJ denied Moody's claim. R. 13.

## V. PLAINTIFF'S CLAIMS

Plaintiff presents two issues for the Court to consider in its review of the Commissioner's decision: (1) Whether the ALJ erred by failing to properly reject Mr. Moody's pain testimony prior to issuing her unfavorable decision; and (2) whether the ALJ erred by assigning substantial weight to the medical opinions expressed by Dr. Harrison-Hollinger that are more restrictive than her RFC finding. Doc. 12 at 2.

## VI. DISCUSSION

### A. Rejection of Pain Testimony

First, Moody claims the ALJ failed to apply the Eleventh Circuit's three-part pain standard when considering Plaintiff's subjective complaints of pain. The three-part pain standard expressed by the Eleventh Circuit "requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain." *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). If Plaintiff establishes evidence of an underlying medical condition and either part two or three of the test, the ALJ must then make a credibility determination about Plaintiff's descriptions of his pain. "If the ALJ decides not to credit a claimant's testimony as to [his[ pain, [s]he must articulate explicit and adequate reasons for doing so. [. . .] A clearly articulated credibility finding with substantial supporting evidence in the record will not be disturbed by a reviewing court." *Foote v. Chater*, 67 F.3d 1553, 1561–62 (11th Cir. 1995) (citing *MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986)).

Moody avers that "the ALJ's purported reasons to discredit his pain testimony are not reasonable and lack the support of substantial evidence thereto." Doc. 12 at 7. Moody further asserts that the evidence of record "support his pain testimony regarding the effects and resulting limitations that his uncontrolled type I diabetes caused him to experience." Doc. 12 at 7.

Plaintiff does not dispute that the ALJ thoroughly and explicitly articulated his reasons for discrediting Moody's pain testimony. S*ee* R. 21–24. Thus, the only determination left for the Court is if the ALJ's credibility finding is supported by substantial evidence. This Court has reviewed the determination, along with the entire record in this case, and finds that the ALJ properly articulated his reasons for discrediting Plaintiff's complaints as to the severity of his pain.

The ALJ "articulate[d] explicit and adequate reasons," *Foote,* 67 F.3d at 1561, for her determination, citing four general reasons for her opinion. First, the treatment notes show that Moody has not been totally compliant with his medication regime or his diabetic diet that were prescribed. R. 21–24. Next, the treatment records indicate that his noncompliance could be the cause for his uncontrolled diabetes and has led to some of his hospitalizations and office visits. R. 21–24. Additionally, there are lack of medical records in which Moody complained about neck and arm pain. R. 21–24. Finally, Moody has had fairly benign physical examinations. R. 21–24. Ultimately, the ALJ held that:

> The claimant's statements concerning his impairments and their impact on his ability to work are not entirely consistent in light of discrepancies between the claimant's assertions and information contained in the documentary reports and the reports of the treating and examining practitioners. The claimant has no neurological deficits, significant weight loss, or muscle atrophy, generally associated with severe pain on a regular and continual basis. Social Security Ruling 96-8p provides that ordinarily, a person's residual functional capacity is the individual's maximum (versus the minimum) remaining ability to do sustained work activities in an ordinary work setting, on a regular and continuing basis, versus the least a person can do. Thus, the above announced residual functional capacity is reasonable for the claimant and supported by the medical evidence. Further, no treating or examining medical source has provided sufficient objective evidence to support a recommendation that the claimant restrict his activities or reported

limitations regarding the capacity for work-related tasks that are inconsistent with the assessment of residual functional capacity in this decision.

Although the undersigned does not find the claimant at all times symptom free, the evidence does not support the degree of limitation the claimant alleges at any time since his alleged onset date. The undersigned generously considered the claimant's subjective complaints in the residual functional capacity assessment, which takes full account of the objective findings, incorporates the recommended limitations of the consultative and review physicians, and accords the claimant every reasonable benefit of the doubt.

R. 24. The record in this case supports the ALJ's opinion.

For example, on January 23, 2014, Moody visited Neurology Consultants of Montgomery, P.C. with complaints of possible seizures.[3] Following a physical exam and scans, Dr. Larry Epperson noted that "[t]hese are subjective complaints and I have no objective findings." R. 273. Dr. Epperson explained to Moody that he does not do disability ratings, explained his process, and stated "I believed that they had pain, but I cannot prove they have the degree of pain that they say that they have, and in the setting of a normal neurological exam and normal neurologic workup, I am releasing them to work full duty." R. 273.

Following his June 28, 2014 motor vehicle accident, Moody underwent discectomy surgery of his C5-C6. R. 312. The July 6, 2014, discharge summary indicates that he did very well post-operatively, during his hospital stay they were able to get his blood sugars under control, they prescribed him new home diabetic medication, and they discharged him in stable condition. R. 312. Moody had several post-operative visits with Dr. F. Donovan

---

[3] Moody initially went to Neurology Consultants of Montgomery, P.C. in 2012 with complaints of possible seizures. R. 275. Dr. Epperson's impression was "[q]uestionable generalized seizures," and he prescribed seizure medication and instructed Moody to not drive for six months, and do not operate heavy machinery or climb for four weeks. R. 278–79.

Kendrick, MD, which generally all noted that he was doing well and his pain was to be expected following surgery and will improve over time. For example, on September 23, 2014, Moody's post-operative assessment denotes "Cervical Pain, I think for the degree of damage of his nerve root. He is going to take some time to heal. We will see him back in 6 weeks. Overall he is doing about as expected." R. 431–36.

On July 1, 2014, Moody was referred to Dr. Gabriel U. Nazareno, MD, for diabetes services. R. 321. Dr. Nazareno noted complaints of back pain and numbness, tingling, and discomfort in upper extremities. R. 322. He adjusted Moody's diabetes prescriptions and instructed Moody on his diet but did not provide any pain treatment. R. 321.

On November 30, 2015, Moody was referred to Dr. Celtin Robertson, MD, for a consultative examination. R. 474. Moody provided Dr. Robertson with his medical history including his uncontrolled diabetes, seizures, and pain in his upper extremities and abdomen. R. 474–75. Dr. Robertson reviewed Moody's medical record and conducted a full examination. R. 474–78. Dr. Robertson found that the "[p]hysical examination was unremarkable with the exception of the claimant appearing very worried about his condition." R. 22. Based on his assessment, Dr. Robertson issued his "Functional Assessment/Medical Source Statement" that is consistent with the ALJ's RFC. R. 478. For example, Dr. Robertson "opined the claimant could occasionally lift up to 20 pounds, has no limitations in fine or gross manipulation, and should avoid workplace hazards such as driving, working at unprotected heights, or use machinery due to increased risk of injury as a result of seizures." R. 23.

On September 6, 2016, Moody was hospitalized with complaints related to his Type 1 diabetes and diabetic ketoacidosis. R. 520. Dr. Garg Manisha, MD, noted that Moody reported compliance to his insulin regime, advised him to count his carbohydrate intake, adjusted his medication regime, referred him to the Certified Diabetes Educator ("CDE") "for comprehensive diabetes teaching," and emphasized the importance of compliance and hypoglycemia. R. 531. On September 20, 2016, Moody returned to the hospital due to getting sick "over the weekend" due to his uncontrolled Type 1 diabetes, despite reported compliance with medication. R. 493, 503. Dr. Manisha confirmed that Moody's Type 1 diabetes was uncontrolled and noted that there was "questionable compliance and reliability." R. 501. Specifically, Dr. Manisha stated that despite reporting that he was taking his medication regularly, he was "prescribed toujeo 30 units on his last visit 2 weeks ago along with titration up to 40 units, he was given 1 sample pen from clinic which has 300 units. [H]e was unable to fill his prescription, so with 1 sample he had enough for 8–10 days, so he should be out of his toujeo 3 or 4 days back (over weekend)." R. 501, 503–04. Dr. Manisha also noted that Moody failed to make an appointment with CDE for teaching. R. 503. Dr. Manisha "strongly advised" Moody to "take insulin as prescribed" and, again, advised him to go to the "CDE diabetes education Center for comprehensive diabetes teaching[]." R. 502, 504.

The following outlines extensive treatment records from Dr. Richard R. Cunningham. On September 1, 2015, Moody began treatment with Dr. Cunningham regarding lower back pain associated with degenerative joint disease and his Type 1 diabetes. R. 551. Dr. Cunningham's impression was chronic pain syndrome and Type 1

diabetes mellitus that is poorly controlled. R. 552. Dr. Cunningham recommended a referral to an endocrinologist, "reviewed low-protein, high-carb, no-concentrated-sweet diet with him at some length as well as with his wife," and re-prescribed the same medications. R. 553. Dr. Cunningham stated that Moody will "[c]ontinue with Suvoxone as he has done well with this and overall pain is fairly well controlled with this. I will reluctantly continue his Xanax 1 mg t.i.d. given the fact that he has been on this for many years as well as there is a history of seizure disorder." R. 553. On September 29, 2015, Dr. Cunningham noted Moody has done very well on his medication without side effects, and he reported that his mood has been good and that he had no complaints. R. 557–59. Dr. Cunningham also reviewed Moody's uncontrolled diabetes and "encouraged his diet as well as compliance with followup with his primary care physician for management of this." R. 559. On January 5, 2016, January 19, 2016, and February 23, 2016, Dr. Cunningham, again, noted no complaints and that he encouraged Moody to follow his recommended diet as well as compliance establishing a primary care physician. R. 564, 570, 572.

On February 23, 2016, Dr. Cunningham completed a "Physical Capacities Evaluation," in which he provided his opinion on Moody's "ability to do work related physical activities on a sustained basis in a work setting." R. 485. Dr. Cunningham opined that Moody suffers from "chronic cervicalgia and neuropathy," "[Cervical] Spine Surgery with subsequent chronic pain/nerve damage," and hospitalizations with "multiple issues secondary to Diabetic Ketoacidosis." R. 486. Dr. Cunningham provided his limitation assessment and concluded that Moody is "very functionally limited due to his multiple chronic debilitating health issues." R. 486. The ALJ assigned this "medical source

opinion" little weight because he found that it is "not supported by his own treatment notes, nor the other objective medical evidence of record." R. 22.

Moody returned to Dr. Cunningham's office on April 12, 2016, with no complaints and felt that he has had "better pain relief with three films daily." R. 581. Dr. Cunningham noted that he had better control of his diabetes, and, again, encouraged his compliance with the recommended diet and establishing a primary care physician and endocrinologist. R. 581–82. At a May 10, 2016, follow-up appointment, Moody reported that he had no side effects, that his pain was well controlled, that his pain had gotten worse because he reduced his medication due to an issue with Medicaid coverage, but that he otherwise had no complaints. R. 584. Dr. Cunningham, again, encouraged his diet and compliance with establishing a primary care physician. R. 584. On June 7, 2016, Dr. Cunningham noted that Moody reported "[b]etter pain relief when he had three films daily but has done ok with current meds." R. 587. Dr. Cunningham continued to encourage his diet and compliance in establishing a primary care physician. R. 587.

On August 3, 2016, Dr. Cunningham stated that he reviewed Moody's last three urine toxicology reports and the data was not consistent, so he reviewed the reports with Moody and directed that he needs to be fully compliant with prescriptions. R. 596. Dr. Cunningham noted that the "[p]ain is overall well controlled." R. 596. On August 30, 2016, Moody reported that his medication was reduced within the last month and, as a result, is experiencing more pain than usual, but Dr. Cunningham stated that Moody "has done very well on the buprenorphine overall." R. 601. Finally, at October 6, 2016, and

November 11, 2016, follow-up appointments, Moody reported "[n]o acute complaints." R. 604, 607.

"[A] clearly articulated credibility finding with substantial supporting evidence in the record will not be disturbed by a reviewing court." *Foote*, 67 F.3d at 1561–62. The Court finds the ALJ's determination related to Moody's complaints of pain to be supported by substantial evidence and, thus, affirms her decision.

### B. Weight of Dr. Harrison-Hollinger Medical Opinion

Next, Moody argues that "the Commissioner's decision should be reversed, because the ALJ assigned substantial weight to the medical opinions expressed by Dr. Harrison-Hollinger [ ] which are more restrictive than her RFC finding." Doc. 12 at 7. On November 19, 2015, at the request of the Social Security Administration, Moody received a psychological consultative examination from Dr. Karen Harrison-Hollinger, Psy.D. R. 480. Dr. Harrison-Hollinger found, in relevant part, that the "[e]valuation suggests that Mr. Moody is **mildly impaired** in his ability to understand, remember, carry out instructions but **moderately to severely impaired** in his ability to respond appropriately to supervision, co-workers and work pressures in a work setting." R. 483 (emphasis in original). The ALJ's RFC included that "[t]he claimant is limited to performing simple routine tasks, is limited to simple work related decisions and his time off task can be accommodated by normal breaks. He can frequently respond appropriately to supervisors, coworkers and the general public." R. 20. Additionally, the ALJ discussed Dr. Harrison-Hollinger's opinion in great detail within the decision and assigned her opinion "substantial weight." R. 23.

Moody argues that the Undersigned has previously found reversable error where the ALJ assigned "great weight" to the findings of an examining physician, yet the RFC was less restrictive than the examining physician's opinion. Doc. 12 at 9 (citing *Cox v. Astrue*, No. 1:11CV519-WC, 2012 WL 2445067, at *3 (M.D. Ala. June 27, 2012)). Moody asserts that similar to the facts in *Cox*, here, "Dr. Harrison-Hollinger's medical opinions of record [. . .] are more restrictive than as found by the ALJ in her RFC finding." Doc. 12 at 9. Specifically, Moody points to the fact that the ALJ "determined Mr. Moody can 'frequently respond appropriately to supervisors, coworkers and the general public;'" however, Dr. Harrison-Hollinger opined "that Mr. Moody was moderately to severely impaired in his ability to respond appropriately to supervision and coworkers." Doc. 12 at 9. Moody asserts that "moderately to severe" is a greater limitation than "frequently," and the ALJ did not explain why she did not use Dr. Harrison-Hollinger's more restrictive opinion. Doc. 12 at 10.

Moody omits several key distinctions between the facts in this case and the facts presented in *Cox*. First, the ALJ in *Cox* assigned the examining physician "great weight." *Cox*, 2012 WL 2445067, at *3. Here, the ALJ only assigned Dr. Harrison-Hollinger "substantial weight," not "great weight." R. 23; *see also* 20 C.F.R. 404.1527(c)(1)–(6). Next, in *Cox*, the ALJ wholly failed to discuss or account for several limitations in the examining physician's opinion in the RFC. *Id.* at *4. Here, the ALJ did not fail to discuss Moody's ability to respond appropriately to supervision and coworkers in her RFC, but rather, Moody's ability to respond appropriately to supervision and coworkers was explicitly discussed in the ALJ's RFC. R. 20. Finally, and most critical, in *Cox*, the

Undersigned held that "the error is more damaging in this case, where the ALJ relied so heavily on the examining physician's opinion and rejected that of Plaintiff's treating physician." *Id.* at *4. Here, the ALJ did not rely as heavily on the examining physician's opinion, nor did she reject the treating physician's opinion based upon the examining physician's opinion. The ALJ explicitly stated that "Dr. Harrison-Hollinger is not a treating medical source and [her] opinion is not entitled to controlling weight." R. 23.

Additionally, Moody's RFC with respect to responding to supervision and coworkers is substantially supported by the record in this case, which consistently shows that Moody did not leave his employment due to any difficulties with responding to supervision and coworkers. Indeed, Moody has repeatedly indicated through testimony in this case as well as throughout the medical records that he was forced to leave his employment due to experiencing seizures on the job due to his uncontrolled diabetes, which often led to him "passing out." R. 41, 475, 482. Further, Moody explicitly testified that he does not have any problems with responding to supervision, co-workers, or other people generally. R. 53. Thus, Moody's argument that the ALJ should have assigned him a more restrictive ability to respond to supervisors and coworkers is somewhat disingenuous when Moody himself testified that he had no problems doing so.

Ultimately, the "determination of residual functional capacity is within the authority of the ALJ and the assessment should be based on all of the relevant evidence of a claimant's remaining ability to do work despite [his] impairments." *Beech v. Apfel*, 100 F. Supp. 2d 1323, 1330 (S.D. Ala. 2000) (citing 20 C.F.R. § 404.1546). The Court finds the

ALJ's residual functional capacity assessment to be supported by substantial evidence and, thus, affirms her decision.

## VII. CONCLUSION

Based on the foregoing, the undersigned concludes that the Commissioner's decision is supported by substantial evidence and based upon the proper legal standards. Accordingly, the decision of the Commissioner is AFFIRMED.

A final judgment will be entered separately.

DONE this the 26th day of March, 2020.

/s/ Wallace Capel, Jr.
WALLACE CAPEL, JR.
CHIEF UNITED STATES MAGISTRATE JUDGE